IN THE UNITED STATES DISTRICT COURT FOR

THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Samantha Guery, individually and on behalf of all others similarly situated,<br><br>      *Plaintiff*,<br><br> v.<br><br>DraftKings, Inc.<br><br>      *Defendant*. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

   Plaintiff Samantha Guery ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), brings this class action against Defendant DraftKings, Inc. ("DraftKings" or "Defendant"). Plaintiff makes the following allegations based on personal knowledge as to her own acts, and upon information and belief and the investigation of counsel as to all other matters.

## Nature of the Action

   1.  In 2018, the Supreme Court held that states could legalize sports betting. This opened the doors for sportsbooks (such as DraftKings) to access millions of new potential bettors.

   2.  Sportsbooks were highly motivated to capture new customers, particularly since there would be intense competition for new customers in these nascent marketplaces. To make inroads into these lucrative new markets, sportsbooks invested heavily in advertising and promotional incentives, such as sign-up promotions and bonuses.

   3.  DraftKings offered multiple promotions to attract new users, build market share, and maximize its earning capacity. DraftKings knew that new users could potentially be converted to long-term customers, which would be extremely profitable for the sportsbook. DraftKings targeted certain promotions at potential new customers who may have been reticent about risking

their money. But rather than put as much of its own money on the line as it implied to new customers, DraftKings used misleading promotions to lure new users into opening accounts while believing the promotional offers they responded to were financially more advantageous to the consumers than they actually were.

4. One such deceptive practice was DraftKings' promotion that told new users that if they signed up, their first bet would be risk free ("Risk-Free Bet"). The bets, however, were not as advertised. The promotion required that the customer place a bet with their own money. If a customer lost their bet, they were not returned to their original position. Instead, their accounts were credited with a "Free Bet" that was worth less than its counterpart in U.S. dollars implied by the promotional materials.

5. Free Bets cannot be withdrawn and must be wagered to be converted to U.S. dollars. Furthermore, wagers made with Free Bets are not paid out like wagers made with U.S. dollars. A $100 winning bet made with U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of 9%, which results in a payment of approximately $191. By contrast, a winning bet made with a $100 Free Bet converts only to $100 US dollars less vig, which results in a payment of approximately $91.

6. The Free Bet is worth less than half of the initial bet. The difference renders the supposed "risk-free" promotion anything but risk free.

7. DraftKings has paid for large-scale marketing, including in television and print advertisements, in-arena marketing, and extensive internet and social media advertising to promote the false Risk-Free Bet. These advertisements contain materially deceptive representations that allowed DraftKings to sign up thousands of new customers. These representations and omissions, which Plaintiff and other reasonable consumers relied upon, were misleading and false.

8. These marketing representations and omissions violate state consumer protection law, as discussed in detail below. Reasonable consumers, including Plaintiff, were misled to their detriment. They did not receive the advertised benefit of the promotional Risk-Free Bet, and in many cases they placed larger bets than they would have but for the misleading advertising.

9. Plaintiff seeks actual damages, punitive damages, and statutory damages to compensate herself and the Class for the injury inflicted on them by DraftKings and to prevent DraftKings from continuing to deceive consumers.

## PARTIES

10. Plaintiff Samantha Guery is a resident of the Bronx, New York. Plaintiff Guery made a Risk-Free Bet in July 2023, which she lost, resulting in a Free Bet that was worth substantially less than its advertised cash equivalent.

11. Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2023, DraftKings is a publicly traded company that trades on the Nasdaq Stock Exchange.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendant. The number of members of the proposed class in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

13. This Court has personal jurisdiction over Defendant because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant does business in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

15. In 2018, the Supreme Court ruled in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that states could regulate sports betting within their borders. State legislatures moved quickly and, as of April 2023, sports betting was legalized in 36 states and Washington, DC. New York State legalized sports betting and sportsbooks began operations on January 8, 2022.

16. Since 2018, the market for sports betting has exploded. Total sports betting revenue in the US jumped from $430 million in 2018 to $7.56 billion in 2022. [1] In 2023, sports betting revenue jumped to $10.92 billion, a 44.5% year over year increase. [2]

17. This rapid expansion of the industry has led to fierce competition between sportsbooks. As successive states legalized sports betting, the various operators would bombard the state with advertisements and promotions in order to capture valuable market share.

---

[1] Total Sports Betting Revenue in the United States from 2018 to 2022, Statista, https://www.statista.com/statistics/1126480/sports-betting-revenue-us/.

[2] U.S. Sports Betting Industry Sets Record With nearly $11 Billion in 2023 Revenue, Sports Business Journal, https://www.sportsbusinessjournal.com/Articles/2024/02/21/us-sports-betting-industry-record-revenue-2023#:~:text=U.S.%20sports%20betting%20industry%20sets%20record%20with%20nearly,for%202023%2C%20according%20to%20Doug%20Greenberg%20of%20ESPN.com.

18. Sportsbook companies also developed mobile apps to make it convenient for customers in these fledgling markets to place bets almost anywhere at any hour.

19. DraftKings was no exception. DraftKings' sales and marketing expenses totaled $1.186 billion in 2022. DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads would often showcase various promotions that DraftKings was running, typically targeting new users.

20. DraftKings knew that adding new users was critical to its long-term success even at the cost of short-term profitability. According to DraftKings' 10K report, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts, which may not have a favorable return on investment."

21. DraftKings understood that winning new users now would pay dividends over time. Although average customer acquisition may cost hundreds of dollars, being the first sportsbook a customer signs up for normally pays for itself many times over. In 2020, DraftKings reported that a customer's lifetime value to a book was around $2500, while DraftKings' average customer acquisition cost was only $371.

22. While many American bettors have more than one sportsbook account, it is beneficial to be a bettor's first account. According to McKinsey partner Dan Singer, "When a market opens up, you've got to get out there and start acquiring, because being the first book that someone downloads gives you roughly twice as much action as being the second or the third."[3]

23. DraftKings' customer retention rate in 2021 was greater than 80%, yet its revenue retention rate was 100%. Revenue retention rate is a metric that measures the amount of revenue

---

[3] Sportsbooks Are Sweating Their Billion Dollar Marketing Bet, Washington Post, https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/.

that a company's existing customers generate over a set period, often on a yearly basis. It excludes revenue from new customers. So DraftKings lost around 20% of the initial customers that had signed up for the platform. However, their revenue from that initial cohort of customers remained the same. This is because the customers that do remain increase their total amount spent on the platform over time. On average new customers become profitable for the sportsbooks after three to four months.[4]

24. Once the sportsbooks have acquired the desired market share in a state, they begin to shift their focus to customer retention, which is significantly cheaper than customer acquisition. At the customer retention stage, sportsbooks expect to recapture their investment. According to some financial analysts, DraftKings and other books have reached this stage in some of the states that were early adopters of legalized gamblers.[5]

25. DraftKings' preferred audience is new users and casual gamblers—those who are most likely to lose money. Its CEO admitted: "This is an entertainment activity. People who are doing this for profit are not the ones we want." In fact, sportsbooks, including DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets.[6]

---

[4] New York Tough: Books Face Delicate Balance In War To Acquire New Sports Bettors, Sportshandle, https://sportshandle.com/new-york-sportsbooks-customer-acquisition-costs/ (last visited May 16, 2023)

[5] Online Sportsbook: A Shift In Player Retention?, Gaming America, https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention (last visited May 16, 2023)

[6] Why DraftKings CEO Jason Robins Said "People Who Are Doing This For Profit Are Not The Players We Want, BettingUSA.com, https://www.bettingusa.com/draftkings-comments-controversy/

26. Legalizing gambling leads to a large rise in gambling addiction in that state. The National Council on Problem Gambling reported an increase of 43% in calls in 2021, as well as an increase of 84% in online chats.

27. Similarly, states that have legalized sports betting have seen dramatic increases in calls to gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the first year after legalization; in Massachusetts, calls are up 276% since 2020; in Ohio, which just opened the door to legal sports betting in January 2023, calls to the state's problem gambling hotline tripled in the first month compared to the same period last year; in the first year after Virginia legalized sports gambling, calls climbed 387%; in Illinois, calls rose 425% between 2020 and 2022.

28. These trends are particularly prevalent in young men in their 20s, a key demographic for DraftKings and other sportsbooks.

29. According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30% from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[7]

30. DraftKings touts that its "[s]ophisticated data science drives marketing decisions," which "delivers the right message, to the right user at the right time," to maximize return on investment.

31. Unsurprisingly, the target demographic overlaps heavily with the group most at risk of gambling addiction. As of 2021, 90% of DraftKings' sportsbook users were male and 53% were between the ages of 18-34.

---

[7] These are the Real Dangers of the Sports Betting Boom for Young Men, Megan Gunn, Newsweek Magazine, https://www.newsweek.com/2023/04/07/sports-betting-boom-linked-rising-gambling-addiction-anxiety-suicide-1789055.html

**"Risk-Free Bet" Promotions**

32.     DraftKings offered a variety of substantially similar Risk-Free Bet promotions. The dollar amount that could be placed "risk free" varied but could be up to $1000.

33.     Such tantalizing offers have been effective at persuading new users to open betting accounts they may not otherwise have opened and to bet amounts they may not otherwise have bet. After DraftKings' lured users into opening accounts based on the promise of Risk-Free Bets, many new users discovered their money was indeed at risk.

34.     The false promise of "risk-free" bets was specifically designed to overcome many new users' natural resistance to gambling and to grab market share in the newly legal sports betting industry. DraftKings was well aware of the dangerous effects of such promises on new users' thinking: If it's risk free, why not bet more? Customers in states where gambling has not previously been permitted could more easily fall prey to such promotions, endangering their financial well-being.

35.     DraftKings deliberately did not communicate that customers availing themselves of the Risk-Free Bet promotion would only be credited with a Free Bet. A commonsense understanding of the "$1000 Risk-Free Bet" offered on the promotional materials made no suggestion that the Risk-Free Bet would be turned into a Free Bet that was, in fact, far less valuable than the same figure in U.S. dollars. DraftKings deliberately sowed this confusion by using the dollar symbol ($) in its promotional materials.

36.     Here's how DraftKings' Risk-Free Bets actually work. When a consumer places a bet as part of a risk-free bet promotion, they are wagering their own money. If the consumer wins, the initial bet is paid out exactly the same as a normal bet, and the promotion has no effect. Thus,

a winning bet of $100 would pay out =approximately $191 (after DraftKings takes its typical 9% rake).

37. However, if the customer loses their initial bet, their account is debited the amount of their loss in U.S. dollars (in this case $100) and their account is credited with a "$100 Free Bet." These Free Bets, however, have no cash value, are non-transferrable, and non-refundable. Additionally, when a customer wins a bet with the Free Bet, they do not receive the stake back. If a customer uses their $100 Free Bet on a wager with even odds (like a coin toss), they end up with $91 if they win (because of the vig discussed above), and $0 if they lose. By contrast, if the customer had been given $100 cash to bet, they would have $191 if they won, and $0 if they lost. Therefore, the $100 Free Bet is worth roughly half as much as $100 of U.S. currency. Further, the Free Bet is only suitable for gambling, and there is no guarantee that the person will win the Free Bet, whereas cash need not be gambled and could simply be deposited in the customer's bank account to be used in any manner.

38. As soon as the customer loses their initial bet, they are not in the same position as they were before placing their bet, and thus there is nothing risk free about the transaction.

### Regulators Recognize the Sportsbooks' Misleading Promotion Language

39. Regulators have caught on to the misleading language concerning Risk Free Bets. Several illustrative examples are discussed below.

40. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and

conditions isn't good enough, he added. "We are not supportive of trying to put the truth in small print."[8]

41. DraftKings was sent a notice of violation by the Ohio Casino Control Commission which included a penalty of $150,000 for the use of "risk-free bet" language. Previously Draft Kings had received a notice of violation from the same commission for advertising to individuals under the age of 21.

42. The New York Attorney General's office admonished: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness." [9]

43. New York Attorney General Letitia James went on to clarify: "I urge all New Yorkers watching the Super Bowl and betting online for the first time to be careful – don't let scammers game your gamble. Before placing a bet, do your research into the platform, read the fine print of the offer, and follow our other tips to avoid any red flags and keep the odds in your

---

[8] Sportsbooks Call Them Risk-Free Bets. Just Don't Read the Fine Print. Danny Funt, Washington Post, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/
[9] Consumer Alert: AG Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl, Kevin Thomas, New York State Senate, https://www.nysenate.gov/newsroom/articles/2022/kevin-thomas/consumer-alert-ag-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became%20legal%20in%20New,often%20come%20with%20strings%20attached%20without%20consumers%E2%80%99%20awareness.

favor. Online sports betting companies that fumble their advertising to mislead New Yorkers can expect to hear from my office."[10]

44. The Massachusetts Gaming Commission prohibits sportsbooks from running promotions advertised as "free" or "risk free" if a bettor needs to risk their own money as part of the promotion.

45. The NBA took a stance on the language, banning it on platforms operated by the NBA or its franchises in February of 2023.

46. Many of the sportsbooks started to move away from the "risk-free" language in 2022.

47. According to the Washington Post in a December 2022 article, Betfred COO Bryan Bennett admitted publicly that the company's prior "risk-free" offers were "unclear":

> "We had some unclear terms, which doesn't do anyone any good," Chief Operating Officer Bryan Bennett said. "You get angry customers and customer support agents getting beaten all day. We made a conscious decision to not do that anymore and try to be as upfront as possible."[11]

48. DraftKings advertised a risk-free bet of up to $1000 on several occasions.

---

[10] CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl, Office of the New York State Attorney General, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=%E2%80%9CI%20urge%20all%20New%20Yorkers%20watching%20the%20Super,flags%20and%20keep%20the%20odds%20in%20your%20favor.
[11] Sportsbooks Call Them Risk-Free Bets. Just Don't Read the Fine Print. Danny Funt, Washington Post, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/





49. DraftKings also offered the promo in smaller dollar amounts.



50. DraftKings' mobile app and online website feature numerous invitations and advertisements to sign up for the DraftKings service. While registering, a customer would have been shown promotional offers, some of which made the same or materially similar promises outlined above.

51. At no time in DraftKings' marketing or during DraftKings' sign-up process were Plaintiff and the Class Members warned of the true financial risks of using DraftKings' services to place a bet—including the immediate and acute risk of losing the entire amount in that initial bet and the risk that losses will never be reimbursed by Defendant.

52. Defendant advertises bets as "risk-free." However, the marketing (including during the sign-up process) misrepresents and omits several key facts about the service. First, there is necessarily risk, because a consumer cannot simply cash out a refund, but instead must place another bet (the so-called Free Bet). Second, the Free Bet is not worth its cash equivalent even if the cash were gambled because the consumer does not receive the stake back if they win (unlike with a cash bet).

53. As a result, users like Plaintiff who signed up for and used the DraftKings risk-free promotion and lost their first bet, ended up losing a substantial portion of their initial stake.

## **CLASS ALLEGATIONS**

54. Plaintiff brings this action on behalf of himself, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> Any DraftKings customer who wagered in the state of New York and utilized a DraftKings promotion advertising a "risk-free" bet with Defendant and lost their first bet.

55. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

56. This case is properly brought as a class action under Rule 23(a) and (b)(3) for the following reasons:

   a. **Numerosity:** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiff at this time. However, Plaintiff believes there are tens of thousands and potentially even hundreds of thousands of Class Members. The number and identity of Class Members can be determined through discovery of Defendant.

   b. **Commonality and Predominance:** Plaintiff and Class Members were all injured by the same unlawful conduct, as the misleading advertisements were intentionally distributed to maximize visibility. Therefore, there are common questions of law and fact shared by the Class, and those questions and their common answers will predominate over any questions that might affect particular Class Members.

    c. **Typicality:** Plaintiff's claims are typical of those of the Class. Plaintiff's injury has been caused by the general unlawful conduct of Defendant, which would provide the same basis for a claim for all Class Members.

    d. **Adequacy of Representation:** Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to the Class. Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class actions.

    e. **Superiority:** A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Class Members' claims are not efficient or economical for them to litigate on an individual basis. Even if the Class Members could afford it, the court system could not, as judicial resources would be tied up in the management and oversight of tens of thousands of actions, all based on the same alleged wrongdoing of Defendant. This is an appropriate forum in which to litigate these claims, as New York State's population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of N.Y. Gen. Bus. Law § 349**

57. Plaintiff repeats and realleges the allegations in paragraphs 1 through 56 as if fully set forth herein.

58. Plaintiff brings this claim against DraftKings under New York General Business Law ("GBL") § 349 on behalf of herself and the Class.

59. New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . . ."

60. DraftKings' unlawful consumer-oriented conduct was misleading, deceptive, unlawful, fraudulent, and unfair in that Defendant materially misrepresented the nature of its promotions.

61. DraftKings disseminated through the State of New York, through advertising, marketing, and other publications, statements that were untrue and misleading, and which DraftKings knew were untrue and misleading.

62. DraftKings' misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were exposed to DraftKings' material misrepresentations.

63. Defendant made its deceptive and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

64. Additionally, DraftKings' conduct was unlawful. New York law requires that all gambling advertisements "comply with Racing, Pari-Mutuel Wagering and Breeding Law [PML] section 1363 and with advertising guidelines issued by the National Council on Problem Gambling."[12]

65. Plaintiff and the Class have suffered injuries as a result of DraftKings' deceptive conduct.

---

[12] *See* 9 CRR-NY 5325.6.

66. Defendant's conduct as alleged herein constitutes a deceptive act and practice in the conduct of business in violation of New York General Business Law § 349(a) and Plaintiff and other members of the Class have been damaged thereby.

67. As a result of Defendant's recurring deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs. This includes actual damages under GBL § 349, as well as statutory damages of $50 per unit purchased pursuant to GBL § 349.

## SECOND CAUSE OF ACTION
### Violation of N.Y. Gen. Bus. Law § 350

68. Plaintiff repeats and realleges the allegations in paragraphs 1 through 56 as if fully set forth herein.

69. Plaintiff brings this claim against DraftKings under New York GBL § 350 on behalf of herself and the Class.

70. N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

71. N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

72. Defendant's advertising contains a deceptive and materially misleading statement concerning the "risk free" nature of the bets.

73. Plaintiff and the Class have suffered injuries as a result of DraftKings' deceptive conduct.

74. Defendant engaged in its unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

75. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Vehicles were and continue to be exposed to Defendant's unlawful conduct.

76. Pursuant to N.Y. Gen. Bus. Law §350(e) Plaintiff and the Class seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to N.Y. GBL § 350(a1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of DraftKings' unlawful conduct, interest, and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Class, appointing Plaintiff as representative of the Class, and appointing counsel for Plaintiff as Class Counsel;

B. Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C. Declaring that Defendant's policies and practices as described herein constitute a violation of the consumer protection statutes invoked herein;

D.  Enjoining Defendant from the wrongful conduct as described herein;

E.  Awarding actual and/or compensatory, multiple, punitive, and statutory damages in an amount according to proof;

F.  Awarding Plaintiff her reasonable costs and expenses of suit, including attorneys' fees;

G.  Awarding pre- and post-judgment interest to the extent the law allows; and

H.  Awarding such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: April 17, 2024

Respectfully submitted,

*/s/ Charles D. Moore*
Charles D. Moore
**REESE LLP**
121 N. Washington Ave., 4th Floor
Minneapolis, Minnesota 55401
Telephone: 212-643-0500
cmoore@reesellp.com

Michael R. Reese
**REESE LLP**
100 West 93rd Street
Sixteenth Floor
New York, NY 10025
Telephone: (212) 643-9500
mreese@reesellp.com

Christopher V. Le (*pro hac vice* forthcoming)
Brian Drockton (*pro hac vice* forthcoming)
**BOIES BATTIN, LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Telephone: (703) 764-8700
cle@boiesbattin.com
bdrockton@boiesbattin.com

Robert K. Shelquist (*pro hac vice* forthcoming)

Rebecca A. Peterson (*pro hac vice* forthcoming)
Joseph C. Bourne (*pro hac vice* forthcoming)
Laura M. Matson (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 South Washington Avenue
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com
jcbourne@locklaw.com
lmmatson@locklaw.com

*Counsel for Plaintiff Samantha Guery and the Proposed Class*